UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


GAZPROM LATIN AMERICA          )     CASE NO: 4:14-MC-01186
SERVICIOS, C.A.,               )
                               )          MISCELLANEOUS
          Plaintiff,           )
                               )       Houston, Texas
     vs.                       )
                               )  Wednesday, August 26, 2015
LINDSAYCA, INC., ET AL.,       )
                               )   (9:46 a.m. to 10:24 a.m.)
          Defendants.          )


MISCELLANEOUS HEARING

BEFORE THE HONORABLE FRANCES STACY,
UNITED STATES MAGISTRATE JUDGE


Appearances:              See Next Page

Court Recorder:           G. Lyons

Case Manager:             William Bostic

Transcriber:              Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES FOR:**</u>


Plaintiff:                    KEITH MILES AURZADA, ESQ.
                              Bryan Cave LLP
                              2200 Ross Avenue
                              Suite 3300
                              Dallas, TX  75201

                              CRAIG S. O'DEAR, ESQ.
                              Bryan Cave LLP
                              200 South Biscayne Blvd.
                              Suite 400
                              Miami, FL 33131

Defendants:                   MANUEL G. ESCOBAR, ESQ.
                              201 W. Poplar
                              San Antonio, TX  78212

1    **Houston, Texas; Wednesday, August 26, 2015; 9:46 a.m.**

2               **(Call to Order)**

3          **THE COURT:**  Please be seated.  Today is the 26th of

4    August, 2015.  I'm Frances Stacy, United States Magistrate

5    Judge, calling Case Number 2014-1186, *Gazprom Latin American*

6    *Servicios, C.A. versus Lindsayca, Inc.*

7          Okay.  And who's present for this hearing?

8          **MR. AURZADA:**  Good morning, your Honor, Keith

9    Aurzada, Bryan Cave, on behalf of the petitioner.  I have with

10   me my partner Craig O'Dear.  We filed an application for his

11   admission pro hac vice and I ask the Court to let him argue

12   today if that's acceptable.

13         **THE COURT:**  All right.

14         **MR. ESCOBAR:**  Your Honor, Manuel Escobar appearing on

15   behalf of Jean-Marc Pivert.

16         **THE COURT:**  Okay.  So do you-all want to just stand

17   up here at the bench and have our conference?

18         **MR. ESCOBAR:**  Sure.

19         **THE COURT:**  Did you oppose his motion to appear pro

20   hac vice?

21         **MR. ESCOBAR:**  No, ma'am.  I already had told them

22   that I did not.

23         **THE COURT:**  Do you have the order for me to sign?

24         **MR. AURZADA:**  I think it's been uploaded, your Honor.

25   I do not have a physical copy.

4

1          **THE COURT:**  Okay.  Actually the clerk of the court

2  has to approve it and then I'll be happy to sign it.

3          **MR. AURZADA:**  Thank you, your Honor.

4          **THE COURT:**  I'll do that later today.

5          **MR. AURZADA:**  Thank you, your Honor.

6          **MR. O'DEAR:**  Thank you.

7          **THE COURT:**  Okay.  So in the part of the case that I

8  think I have jurisdiction over has to do with the motion to

9  vacate which is Document 16.  That was filed on September 2nd,

10  2014 and a response was filed September 22nd, 2014 and I

11  believe the part that I have power to do something about has to

12  do with an order that I signed on August 4th, 2014 requiring

13  that Mr. Pivert, you know, appear for his deposition and that

14  the -- he should be -- a warrant would issue for his arrest

15  because he didn't appear for his deposition.  This order -- in

16  the first paragraph, it says the reason the order was issued is

17  because of my belief that, "Having considered the motion, the

18          absence of a response and Pivert's failure to appear

19          for his duly noticed deposition, which notice was

20          hand-delivered to Pivert on June 16, 2014 at his

21          residence which is located in this district."

22          I'm now of the opinion that was an incorrect fact --

23  that was not a fact, that the notice was not hand-delivered to

24  him.  So I'd be happy to hear your, you know, discussions about

25  why this order should not be vacated.  It's your motion.

1          **MR. ESCOBAR:**  Well, it's my motion that it should be

2    vacated.

3          **THE COURT:**  Correct.

4          **MR. ESCOBAR:**  All right.  And -- I mean, I sent -- do

5    you want me to address that, Judge?

6          **THE COURT:**  Yes, please.

7          **MR. ESCOBAR:**  Okay.  I think it should be vacated.

8    My client did not receive notice of any of the pleadings that

9    were filed in this case.  We have submitted, we believe,

10   evidence that supports that, that he did not receive any notice

11   of any of the filing of pleadings.  We're not even talking

12   about actual personal service which I think the Court

13   understands that, I mean, he was not even personally served

14   with that particular order that the Court referenced and, I

15   mean, I think that's without question he was not personally

16   served.

17         And so he did not know of these.  He did subsequently

18   learn of them shortly before I filed my -- filed a motion to

19   vacate and counsel insinuates a lot of things about, well, how

20   did you know, et cetera.  Judge, you go to Pacer.  You know, my

21   client did learn that there had been some -- something had been

22   done.  He learned something about something that had been

23   filed.  He contacted me.  He hired me.  You go to Pacer.

24         **THE COURT:**  When did he hire you?

25         **MR. ESCOBAR:**  He hired me, I want to say, about two

6

1    weeks before the motion was filed --

2         **THE COURT:**  Okay.

3         **MR. ESCOBAR:**  -- and so I researched it.  I did a

4    little research on it.  I was getting ready to file the motion.

5    So I contacted counsel and as I recall, the Rules required me

6    to confer with opposing counsel before filing motions and so I

7    called to verify that.  It was at that time that I learned that

8    there was actually a deposition actually set and I think it was

9    set either the next day or the following.  I don't remember

10   exactly when it was but it was within a short time and so I did

11   indicate to counsel that I'd be filing my motion and of course

12   there was no agreement on that.  And so I did file the motion.

13   I had prepared it.  I will tell the Court that I had prepared

14   it.  I had been in some communication with my client and so we

15   proceeded to file the motion.

16        I don't know what else -- I mean, he did exercise, I

17   believe, due diligence at that point.  That's how, you know,

18   basically, you know, we found out about the Court's -- or these

19   motions and the Court's orders.  And so I don't think that

20   there was any notice to him and so certainly with regard to

21   that issue, I think that it would be in the interest of justice

22   certainly for the Court to set aside its orders.

23        **THE COURT:**  Your client is a citizen of France?

24        **MR. ESCOBAR:**  He's a citizen of France, lives in

25   Venezuela.  He does not have an American passport.  He's not a

1    resident alien in the United States.  He doesn't have a green

2    card.

3              **THE COURT:**  Has he ever been to the United States?

4              **MR. ESCOBAR:**  He has been to the United States.  My

5    understanding is that he had been in the United States about a

6    year before this motion -- actually a little bit more than year

7    before this motion was filed and that --

8              **THE COURT:**  For what reason?

9              **MR. ESCOBAR:**  I believe at that point, Judge, he was

10   here as a tourist and he did come here and, you know, we have

11   filed an affidavit to that effect that --

12             **THE COURT:**  He has a house in Houston?

13             **MR. ESCOBAR:**  He owns a house in Spring but, yes, in

14   the --

15             **THE COURT:**  In the jurisdiction?

16             **MR. ESCOBAR:**  -- Houston area -- in the Houston area.

17   He does own a house here.  He does not live in the house.  The

18   last time he was in the house was that time that I was

19   indicating.  He --

20             **THE COURT:**  A year before what?  When was it?

21             **MR. ESCOBAR:**  The year before the movant in this case

22   seeking his deposition filed its motion.  He was here for about

23   a three-month period of time.  He went back to Venezuela and

24   has been in Venezuela ever since.

25             **THE COURT:**  Who lives in the house that he owns?

1          **MR. ESCOBAR:**  Who lives in it?  It's a young man,

2    your Honor, who is actually the son of a friend of his --

3          **THE COURT:**  Okay.

4          **MR. ESCOBAR:**  -- who actually lives in the house.

5          **THE COURT:**  Is that the person that the notice was

6    hand-delivered to for his deposition?

7          **MR. ESCOBAR:**  That's what we understand.  The young

8    man -- his deposition was taken in this case and it's been

9    filed in the records of this court.  And he never opened the

10   envelopes.  I mean, he did indicate that he had -- that a

11   gentleman came to the door, said he wanted to drop something

12   off.  He dropped something off.  He didn't open it but his

13   testimony, he said he put a -- he had a stack there of mail,

14   correspondence, whatever.  He put this -- whatever it was in

15   the stack.  We presume that's where the notice was.  He never

16   opened it.  So we don't know for a fact but --

17         **THE COURT:**  Okay.

18         **MR. ESCOBAR:**  -- but that seems to be the case, your

19   Honor, although I don't think anybody can swear to it at this

20   point.

21         **THE COURT:**  And Mr. Pivert's role in the case in

22   Venezuela that was settled, can you explain that, please?

23         **MR. ESCOBAR:**  Judge, I don't frankly know what his

24   exact role was in this case.  I was speaking to counsel very

25   briefly before the Court called the case.  They want to do some

1   investigation about what his role may have been.  I think that

2   would be accurate to say but other than that, I'm not certain.

3   I can tell the Court -- and we have filed pleadings with the

4   court where the underlying litigation -- I mean, all of it was

5   settled, I mean, period, that initially started this.  And I

6   believe the last time we were here, counsel indicated to the

7   Court that what they were doing is that they were taking kind

8   of like a deposition -- intended to take a deposition kind of

9   in anticipation of possible litigation of my client.  And so

10  there's some insinuation that he was working for both entities

11  at the time.

12          **THE COURT:**  What entities?

13          **MR. ESCOBAR:**  Gazprom, your Honor, and this Lindsayca

14  organization.  There's two organizations.  One is Lindsayca in

15  the United States.  One is Lindsayca in Venezuela.  He works

16  for the Venezuela branch in Venezuela.  And so the information

17  that I've had is that he maybe had, like, a conflict or

18  something like that when he worked for both entities and that

19  -- I'm not entirely sure of that but that's my understanding

20  from what counsel has indicated to me.

21          **THE COURT:**  Well, I'd like to know.  I -- it's my

22  understanding your client is not willing to come to the United

23  States and give his deposition, correct?

24          **MR. ESCOBAR:**  That's correct, your Honor.

25          **THE COURT:**  Is he willing to give his deposition in

1   Venezuela?

2        **MR. ESCOBAR:**  I have asked him.  Judge, it's a little

3   difficult and I told counsel this earlier.  When counsel is

4   saying here, we're going to sue you.  That's why I want to take

5   your deposition -- it's kind of difficult for him to say, okay,

6   come and take my deposition, you know, because I know I'm going

7   to get sued.  So go ahead and take it.  Frankly, Judge, I think

8   it's a little difficult to want to have you deposition taken

9   under those circumstances.  So he has indicated to me that he,

10  you know, does not want to have his deposition taken.

11       I will tell the Court -- and it's in the -- in

12  Gazprom's pleadings -- Gazprom has told the Court that his

13  deposition can be taken in Venezuela under Venezuela rules.  I

14  mean, they can take the deposition down there under the

15  Venezuela rules of court.  And so why do they need this Court's

16  intervention to take his deposition?  Frankly, I'm not exactly

17  sure of that but anyway, that's what they put in their own

18  pleadings.  They have said that the deposition can be taken

19  there and they -- and we're not talking under the United States

20  rules.  We're talking about the Venezuela rules.  It's

21  certainly possible.

22       So if they feel it's so important to take his

23  deposition, I don't understand why they just don't go do it

24  down there.  Certainly this Court's intervention is not

25  necessary.  Judge, he's -- under any tortured reading of the

11

1   facts, he's not a resident of the Southern District of Texas.

2   He certainly was not found here at any time that's relevant to

3   this litigation at this point and, Judge, I mean, I frankly

4   think that the -- then again, the whole issue of having not

5   been provided notice of the various pleadings that were filed

6   in the case.  I think that the motion should be granted, Judge,

7   and that is the motion to vacate the Court's orders and I would

8   so request.

9            THE COURT:  Was the notice hand-delivered to Pivert

10  on June 16th, 2014 at his residence?

11           MR. O'DEAR:  To my knowledge, he was -- it was hand-

12  delivered to the house-sitter --

13           THE COURT:  To the house-sitter?

14           MR. O'DEAR:  -- who we deposed.

15           THE COURT:  That's not adequate service, is it --

16           MR. O'DEAR:  Actually --

17           THE COURT:  -- to depose Mr. Pivert?

18           MR. O'DEAR:  -- actually under 1782, I think that is

19  adequate service.  He had notice.  And this is my -- we didn't

20  file a lawsuit against him.  This is one of the big differences

21  in the 1782 procedure and a more common judicial proceeding.

22  The standards are different.  We're not -- this isn't a

23  lawsuit.  We're here to take discovery and that's it.  And the

24  1782 has been set up with very liberal standards to facilitate

25  that and -- but there was a specific modification to modify the

1    residency requirement.

2           And, you know, the standards on this, as we've laid

3    out in our briefing, are totally different and far more relaxed

4    than if we were suing this man, you know, trying to file a

5    lawsuit and get personal jurisdiction on him in court.

6           Judge Harmon granted our 1782 application and the

7    objective on this discovery -- this gentleman, we believe, was

8    working for us supervising a construction --

9           **THE COURT:**  "Us" is who?

10          **MR. O'DEAR:**  Gazprom, our client -- supervising

11   construction of a project.  And that was the subject of the

12   litigation in Venezuela.  That litigation has been -- it was a

13   multimillion-dollar claim against Gazprom.  It was settled

14   with, as I understand it, a small amount of money going the

15   other direction.  And it was during that -- the course of that

16   litigation that we became aware or concerned about the

17   possibility that Mr. Pivert was actually receiving money

18   benefits or maybe even actually employed by the entity that was

19   building this project that he was supposed to be supervising

20   for us which creates a whole number of concerns obviously for

21   us.

22          So 1782 exists for exactly this type of issue.  It's

23   very analogous to the Texas Rule 202, I think it is, you know,

24   where you get to take a deposition in advance of filing a

25   lawsuit because, you know, you want an opportunity to

1    investigate to make sure and verify your basis for a lawsuit.

2         **THE COURT:**  Well, tell me the facts you're relying on

3    to justify serving the house-sitter as adequate service on

4    Mr. Pivert to appear at a deposition.

5         **MR. O'DEAR:**  Well, we understood that to be his

6    residence.  So we delivered the documents to that residence.

7         **THE COURT:**  Okay.  I'm asking for facts that justify

8    your understanding that was his residence.

9         **MR. O'DEAR:**  I'm not sure how we knew it was his

10   residence.  Do you -- do you know that?

11        **MR. AURZADA:**  No, your Honor.

12        **THE COURT:**  No, you have to persuade me.

13        **MR. AURZADA:**  I think the point from my perspective

14   is that now that he has counsel, he clearly can be served with

15   notice of deposition through the counsel.  You know, as I said

16   in the first hearing, our goal is not to enforce the arrest

17   warrant.  Our goal is to get the deposition.  Now, to your

18   direct point, how did we know that?  That was a fact we --

19        **THE COURT:**  I'm not really worried about how you

20   knew.  I want to know how you qualify for the standards to be

21   applied, the facts that qualify you to apply this scenario, you

22   know, to be able to take his deposition just because he owns a

23   house in Spring.

24        **MR. O'DEAR:**  Well, okay.  That gets into this whole

25   issue of whether or not the requirements for being found in the

1    jurisdiction are met.  The -- and this is what I think is very

2    -- hugely significant.  Okay.

3            So we did give him notice.  It's clear that he got

4    notice.  Now, we gave it through obviously a friend of his who

5    he was asking to sit in his house.  But he got notice and he

6    disregarded the notices and the orders until the one that you

7    signed threatening arrest and that's when he showed up.

8            **THE COURT:**  Okay.  So go back -- go back --

9            **MR. O'DEAR:**  Okay.

10           **THE COURT:**  -- go back to square one.

11           **MR. O'DEAR:**  Yeah.

12           **THE COURT:**  How is that adequate notice?

13           **MR. O'DEAR:**  Well, it's adequate notice because we

14   now know that he is aware of this proceeding, okay, and that he

15   has received --

16           **THE COURT:**  Circular logic.  I want to know how you

17   justify serving his house-sitter in the first place.

18           **MR. O'DEAR:**  Well, because it's -- it is his

19   residence and here's what --

20           **THE COURT:**  Okay.

21           **MR. O'DEAR:**  -- let's go -- let --

22           **THE COURT:**  What are the facts that show it's his

23   residence?

24           **MR. O'DEAR:**  Okay, let's go back, okay.  He then

25   appears through Mr. Escobar and he files a sworn statement with

1   this court.  Mr. Pivert does.

2            THE COURT:  Uh-huh.

3            MR. O'DEAR:  It's a sworn statement.  Now, what we

4   know today is a lot of those statements were false -- just

5   false.  And we have a limited ability to investigate that but

6   we did what we could do which we deposed the house-sitter.  And

7   this is one of the critical things that I'm trying -- I wanted

8   to clear up.  We filed a proposed -- or actually leave to file

9   a supplemental reply and I don't see and my partner doesn't see

10  that the actual supplemental reply was accepted for filing but

11  if it hasn't been, we would ask that your Honor accept that --

12           THE COURT:  I'll accept it.

13           MR. O'DEAR:  -- and consider it because what we did

14  is we deposed the house-sitter and what we learned was many of

15  the things -- you know, Mr. Pivert says, well, you know, I own

16  this house for investment purposes.  Well, the house-sitter

17  testified that Mr. Pivert moved to Houston in that house with

18  his wife and children in, he believes, 2011, maybe 2012.  So in

19  2012, the house-sitter says Pivert was living there with his

20  family.  I attended a party.  His wife and children were there.

21  Okay.

22           Mr. Pivert says, well, I just own this house for

23  investment purposes.  Well, this investment -- he's letting a

24  family friend live there at no rent.  He's paying all the

25  expenses, paying all the utilities.  This gentleman who's

16

1    taking care of the house for him -- there's a car that

2    Mr. Pivert keeps at the house.  He's asking to maintain the

3    car, turn it on every now and then.  He gets mail on a weekly

4    basis at the residence and the house-sitter gives it to the

5    president of the -- or the CEO of the company that Mr. Pivert

6    works for in Houston.  He's got an ongoing relationship with

7    two companies he works for and the other one, I believe he set

8    it up.

9              And, you know, the chain of events about how this

10   notice got to him is -- was established.  The house-sitter gave

11   it to the CEO and the CEO sends the mail to Mr. Pivert in

12   Venezuela is he's not there.  Okay.  And then he -- this -- we

13   go back to the supplemental filing.  There was a new filing

14   after we took this deposition of the house-sitter and, you

15   know, what we did in our supplemental memorandum is walk the

16   Court through the things that were said and not said in that

17   filing.

18             You know, the question is, well, originally he was

19   present at the home for three months in 2013 as a tourist.

20   Well, the house-sitter's testimony shows that's not true and in

21   the supplemental filing, there's no additional sworn statements

22   from Mr. Pivert.  It's just statements of counsel and it

23   doesn't deny that -- what the house-sitter says.  He doesn't

24   deny it.  He just says things like, well, they don't have

25   school records showing the kids went to school.  They don't

1    have statements from neighbors showing how long we lived there.

2    They don't deny that the man lived there with his family.  And,

3    you know, these relationships he has with these two companies,

4    he doesn't deny them.

5              So, I mean, in all due respect to counsel, I don't

6    think Mr. Escobar knows when this man is in Houston and when he

7    isn't.  What we know is he maintains a house here.  He has

8    someone taking care of it for him.  He maintains a car here.

9    That all suggests strongly that this is a -- and he's got a

10   relationship -- an employment relationship with a company with

11   a headquarter here.  He started another business here.  That

12   all suggests that this is an individual who still sojourns in

13   and out of Houston which is the new standard.  It's not

14   residency.  It's whether this person is traveling in and out of

15   the jurisdiction.

16             And so we believe when you look at all of --

17   everything particularly that we lay out in this supplemental

18   reply that response to the sworn statements of Mr. Pivert who

19   -- that are just not true.  I mean, he -- his -- that statement

20   misleads the Court as to what his true relationship with this

21   forum is.

22             Now, with the testimony of the house-sitter, could we

23   -- were we able to establish that he's still, you know, taking

24   flights in and out of here every month?  No, the house-sitter

25   doesn't have that knowledge but I would suggest to you if you

1    read all the testimony and you put it all together, it

2    certainly suggests that this individual has a continuing

3    employment relationship in Houston and continues to own

4    personal property here, a residence that he is having

5    maintained in a manner that you would maintain it if you intend

6    for it to continue to be your residence.

7            And so what we suggest is that under the applicable

8    standards of 1782 for taking discovery to just investigate what

9    the facts are that that absolutely justifies Judge Harmon's

10   original grant of 1782 and it justifies -- and as Mr. Aurzada

11   said, we're not trying to enforce an arrest warrant but it

12   justifies an order from this Court -- maybe it's one that's

13   modified -- but that affirms that this gentleman should respond

14   to this discovery.

15           And we are flexible on location.  I talked with

16   Mr. Escobar this morning about whether, you know, he would work

17   something out.  He said, I'm willing to talk to my client.  But

18   we both, you know, agree we've got to get through this and see

19   where the Court is.

20           **THE COURT:**  Why do you say that now that he has an

21   attorney, you can depose him?  How does that work out?

22           **MR. O'DEAR:**  Well --

23           **THE COURT:**  You said, now that he's hired a lawyer,

24   you can serve him --

25           **MR. O'DEAR:**  I'm saying --

1          **THE COURT:**  -- through his lawyer or what?

2          **MR. O'DEAR:**  No.  I'm saying that now -- the fact --

3    when he originally says, I never got any of this.  I don't even

4    know what's going on, okay, that would be a justification for

5    ignoring discovery requests and Court orders previously --

6          **THE COURT:**  Uh-huh.

7          **MR. O'DEAR:**  -- but clearly what happened is he did

8    get notice.  What we sent him wound up in his possession.  All

9    right.

10         **THE COURT:**  Okay.

11         **MR. O'DEAR:**  All right.  And the fact that he hired

12   counsel shows that that is what happened.  So, you know, what

13   I'm suggesting is the fact that he didn't -- that he missed all

14   the prior deadlines doesn't justify saying, well, then you

15   never have to respond to this valid request under 1782, that

16   it's now time.  You know what the issue is.  You know what the

17   proceeding is.  You have this relationship -- ongoing

18   relationship with Houston.  The Court has all this information

19   that shows his original story is simply not true and there's a

20   lot of evidence that first of all, shows a continuing

21   relationship and suggests circumstantially that it's even more

22   than the house-sitter knows about.

23         **THE COURT:**  Okay.  So what's your offer, to take a

24   deposition somewhere else?

25         **MR. O'DEAR:**  What I would -- what I told Mr. Escobar

1   is that I want -- I'd like to confer with the my client as to

2   -- the issue -- the question I have about Venezuela is I

3   understand there are some travel restrictions for Americans in

4   and out of there.  That's my main hesitation.  So this is a

5   gentleman who obviously travels a lot.  We would be willing to

6   work out an arrangement to do it somewhere other than the U.S.

7   to the extent he's not comfortable coming back here.

8           THE COURT:  Okay.  Like where?

9           MR. O'DEAR:  Well, you know, he's a resident of

10  France -- wherever it's -- wherever, frankly, it's convenient

11  for him.  Maybe somewhere in South America close that's easy to

12  get in and out of.  Panama is a very easy country to be in and

13  out of.  And it's possible Venezuela may work.  I just want to

14  be careful because I'm -- I just got awareness in another

15  situation recently that there may be some travel restrictions

16  there.  I want to make sure I fully understand that.

17          THE COURT:  Okay.

18          MR. ESCOBAR:  Judge, now that the Court's granted his

19  motion to file the pleading that he indicated, I would like an

20  opportunity to respond to that --

21          THE COURT:  Sure, of course.

22          MR. ESCOBAR:  -- but I would point out to the Court

23  just immediately that it's clear that he comes to the United

24  States -- where is it clear?  I mean, there is no evidence that

25  he comes to the United States.  The deposition testimony of

1   Mr. Drake -- Mr. Drake interned.  He interned at this company

2   where they supposedly say that my client worked.  Right.  He

3   interned there in 2014.  Mr. Drake never saw him there and this

4   is in the testimony -- in the deposition testimony.  He says he

5   didn't have an office there.  He didn't -- you know, so far as

6   he knows, he didn't receive mail there.  He didn't get

7   anything.

8           This thing about Mr. Drake saying that he

9   periodically delivers mail to this person -- Mr. Drake said in

10  his deposition, I don't know when I did it but one time, I gave

11  this person my -- his mail, one time.  The entire time I've

12  lived here, one time I gave this guy -- and I forget his name.

13  It's in the deposition -- I gave him the note.  That was it.

14  It was not something that he did periodically, that he did

15  regularly.  He never did any of that regularly.  That was his

16  sworn testimony.

17          This thing about his running a corporation -- another

18  corporation, that corporation was involuntarily dissolved about

19  a year before this case even initiated.  It was involuntarily

20  dissolved by the State of Texas.  I'm not exactly sure why but

21  my guess is they didn't file the proper paperwork in Austin and

22  so it was just automatically dissolved involuntarily.  It was

23  not an ongoing corporation.

24          My client did not work for the Lindsayca United

25  States of America which is in Houston, Texas.  He worked for

1    Lindsayca, the -- a separate corporation in Venezuela.  So he

2    did not work for the same entity here in the United States that

3    they're talking about.

4              As far as Mr. Pivert coming to the United States,

5    Mr. Pivert said that he came to the United States, he recalls,

6    in early 2013 -- in early 2013.  He says he remembers being

7    here for about a three-week period from January to March, more

8    or less, in 2013 and that was when he came as a tourist that I

9    told the Court earlier.  Mr. Drake says that he had seen

10   Mr. Pivert one time at that house.  He wasn't entirely sure

11   when it was.  He said it could have been 2012.  You know, it

12   could have been around that time.  I mean, that is not, you

13   know, so much different from early 2013.  So, I mean, I don't

14   think there's any inherent inconsistency in the testimony and

15   in the affidavit.

16             He wasn't sure of a lot of things.  He wasn't sure

17   whether -- counsel says, well, we know he got the stuff.  We

18   know he got it.  He says, I don't know if he got it.  I don't

19   know if this other gentleman delivered it to him.  I don't know

20   any of those things and it's in his deposition.  He says that.

21   He says that to all -- a series of questions relating to that.

22             As far as coming in and out of Houston, there is

23   absolutely no evidence that he comes in and out of Houston --

24   none.  All we have is conjecture.  We have somebody saying he

25   does without any evidence to support it -- none whatsoever.

1  And, Judge, I mean, he is not a resident of the Southern

2  District of Texas, you know, and certainly he cannot be found

3  here.  He doesn't come here on a regular basis.  I think the

4  term is he doesn't come here consistently.  He just doesn't.

5         THE COURT:  Okay.

6         MR. ESCOBAR:  And so for counsel to be making those

7  types of claims that he does is -- I mean, to me, it's

8  illogical.  I mean, it's really stretching it when you look at

9  the deposition testimony.  He doesn't come here --

10        THE COURT:  Okay.

11        MR. ESCOBAR:  -- and that's the reality of it.  And

12 so --

13        THE COURT:  What -- you know, Judge Harmon is the one

14 who decided that Mr. Pivert was a resident -- or was found in

15 this district under Section (a) of 1782.

16        MR. ESCOBAR:  Yes, ma'am.

17        THE COURT:  My order had to do with whether he was

18 served or not.  So now I'm asking you, even if hand-delivery to

19 his -- person that was living at his house that he owned was

20 not an adequate notice, you know, does he have adequate notice

21 now that they want to take his deposition?

22        MR. ESCOBAR:  That's kind of putting the cart before

23 the horse.  Yeah, he was served with a notice he never got but

24 somebody got it later.  His attorney found out about it.  So

25 now he has notice.  I mean, I think it's putting the cart

1   before the horse, your Honor, very candidly.  My motion is not

2   just to vacate your order --

3           **THE COURT:**  You think that's ineffective?

4           **MR. ESCOBAR:**  I think it's ineffective, correct.  My

5   motion is not just to dissolve your order but it's to dissolve

6   all the prior orders that have also been issued by the Courts.

7           **THE COURT:**  Well, I'm -- I don't have jurisdiction to

8   dissolve Judge Harmon's order.

9           **MR. ESCOBAR:**  I do have that motion though, Judge.

10          **THE COURT:**  Yes, you do.

11          **MR. ESCOBAR:**  I mean, I want the Court to be aware of

12  that.  I'm not abandoning those --

13          **THE COURT:**  Right, right.

14          **MR. ESCOBAR:**  -- and I don't believe that this Court

15  -- well, Judge Harmon, I suppose, had the jurisdiction to issue

16  that order and so, you know, that's certainly our position.  My

17  client was not a resident here.  He was not found here and that

18  continues to be our position.  We have not changed --

19          **THE COURT:**  And he didn't get notice.  That's your

20  position?

21          **MR. ESCOBAR:**  He didn't receive notice either of

22  anything.

23          **THE COURT:**  Okay.  Somehow he found out about this

24  problem on Pacer, you say?

25          **MR. ESCOBAR:**  No, I found out about it on Pacer.  He

1   said he understood that there were some motions -- or he didn't

2   call them "motions."  I forget exactly what he called them but

3   something that had been filed with the court -- he understood

4   some kind of orders and he asked me to look into it.  I got on

5   Pacer which of course I'm familiar with.  So I got on Pacer and

6   sure enough I found them.  That was about a two -- maybe a

7   little less than two weeks before I filed the motion.

8           **THE COURT:**  So you don't really know how he found out

9   about this case or proceedings against him?

10          **MR. ESCOBAR:**  That's correct, your Honor.

11          **THE COURT:**  You don't know?  And he hired you a

12  couple weeks ago?

13          **MR. ESCOBAR:**  No, no, no, a couple of weeks before

14  the motion was filed.

15          **THE COURT:**  Okay.  All right, sorry.

16          Okay, do you have any response?

17          **MR. O'DEAR:**  Yeah.  Judge, the -- this is -- prior to

18  that statement we just heard, it's the first time there's been

19  anything said in this case.  How did this man find out that we

20  had served all these notices and orders?  Okay.  He's -- he

21  came forward with an affidavit originally.

22          So he has the ability and the willingness to give

23  testimony to this Court.  He's demonstrated that but then when

24  we take discovery to show that that testimony that he gave was

25  not truthful, so why didn't -- why haven't -- why hasn't he

1    come forward to answer this question, well, how did you know

2    about this?  Why don't we have a description?  Why don't we

3    have his sworn testimony about how this came to be?  Did he

4    actually -- did it actually work the way the house-sitter said?

5              Apparently it was given to the CEO of my company and

6    the CEO sent it to me.  Maybe that's the truth or did he just

7    hear some rumor in a bar?  I suspect he actually got these

8    documents and that's when he called Mr. Escobar but the whole

9    point is he hasn't come forward with a sworn statement as to --

10   explaining it if it was something that would, you know,

11   constitute not fair notice.  He got the message somehow and now

12   what's clear is that a modified order that says, okay, look,

13   you're not being sued.  We don't have the typical due process

14   and jurisdiction issues.  This is simply a proceeding to take

15   discovery, to do an investigation and the movement -- or the

16   movant for that persuaded Judge Harmon that 1782 requirements

17   have been met.  There have been multiple orders, multiple

18   requests for discovery.  It's time to comply with those and

19   they've indicated they'll work with you on location and let's

20   move forward.

21              **THE COURT:**  Okay.

22              **MR. O'DEAR:**  It's discovery we're entitled to.

23              **THE COURT:**  So is your client willing to give his

24   deposition somewhere?

25              **MR. ESCOBAR:**  I don't know, your Honor.

1          **THE COURT:**  Can you have a conversation about that?

2          **MR. ESCOBAR:**  Sure.

3          **THE COURT:**  And when can you file your response to

4     his additional briefing?

5          **MR. ESCOBAR:**  Can I have a week, your Honor?

6          **THE COURT:**  Sure.  Of course every discovery dispute

7     we strongly encourage the parties to resolve by agreement and

8     if there is anywhere your client would be willing to give his

9     deposition, I'm sure that -- you know, I'm understanding that

10    Gazprom is willing to travel to Paris, for instance, to take

11    your client's deposition.  Is that true?

12         **MR. O'DEAR:**  Any country including potentially

13    Venezuela once -- if I can get that issue cleared but certainly

14    wherever it would be convenient for him, we would work with him

15    and arrange that.

16         **THE COURT:**  I would like you to have a real specific

17    negotiation about that and if you're able to work it out, let

18    me know immediately.  And a week from today, you can file your

19    response to their briefs which is --

20         **MR. ESCOBAR:**  If we -- I'm sorry.  I didn't mean to

21    interrupt but would it be too much to ask for a week from

22    Friday?

23         **THE COURT:**  No, it won't.  Well, today's the 26th.

24    Friday is the 28th and a week from that day is the 4th --

25    September 4th and that's a holiday weekend.  So let's give you

1    until the 8th of September.

2              **MR. ESCOBAR:**  Thank you, your Honor.

3              **THE COURT:**  That is a Tuesday.  Okay?

4              **MR. O'DEAR:**  And, Judge, would it be advisable that

5    we go ahead and -- since our supplemental reply was attached as

6    an attachment to a motion for leave, just go ahead and file it

7    so it officially is on file?

8              **THE COURT:**  Is that necessary, William?  I don't

9    think it is.  We have it in our --

10             **MR. O'DEAR:**  Okay.

11             **THE COURT:**  -- electronic records.

12             **MR. O'DEAR:**  Okay.

13             **THE COURT:**  We're just going to say it's filed now.

14             **MR. O'DEAR:**  It's filed, all right.  Thank you.

15             **THE COURT:**  I'll be able to access that and then you

16   can file your -- you know, whatever reply to that -- response

17   to that but between now and then, I really would appreciate you

18   focusing on --

19             **MR. O'DEAR:**  We will.

20             **THE COURT:**  -- trying to come to some agreement about

21   Mr. Pivert giving his deposition somewhere, you know, by

22   agreement -- just by agreement.

23             **MR. ESCOBAR:**  Question --

24             **THE COURT:**  Yes.

25             **MR. ESCOBAR:**  -- am I to understand by the Court's

1    comments that you're not going to issue recommendations on the

2    actual motion to vacate Judge Harmon's orders?

3              **THE COURT:**  If it was referred to me, I am.

4              **MR. ESCOBAR:**  I thought it was, your Honor, yes.

5              **THE COURT:**  Okay.

6              **MR. ESCOBAR:**  I could be wrong but I'm assuming it

7    was.

8              **THE COURT:**  If it's referred to me, I will issue

9    recommendations, yes.

10             **MR. ESCOBAR:**  I cannot verify it.

11             **THE COURT:**  I'd rather consider it all at one time.

12             **MR. ESCOBAR:**  Yes, ma'am.

13             **THE COURT:**  And after your response is filed.

14             **MR. ESCOBAR:**  Right.

15             **THE COURT:**  Okay.  And totally try to work it out and

16   if you are able to, let me know immediately, please.

17             **MR. ESCOBAR:**  Yes, ma'am.

18             **MR. O'DEAR:**  We will, your Honor.

19             **MR. AURZADA:**  Thank you, your Honor.

20             **THE COURT:**  All right, good luck with your case.

21             **MR. ESCOBAR:**  Thank you, your Honor.

22             **THE COURT:**  Thank you for appearing.

23             **MR. ESCOBAR:**  May I be excused, your Honor?

24             **THE COURT:**  Yes.  Thank you for appearing.

25             Do we have your contact information, Mr. Escobar?

30

1          MR. ESCOBAR:  Yes, ma'am.

2          THE COURT:  Because you recently appeared in the

3   case?

4          MR. ESCOBAR:  No, your Honor.  I've been in the case.

5   I've been in the Southern District for like --

6          THE COURT:  I mean, you recently appeared in this

7   case?

8          MR. ESCOBAR:  Last year.

9          THE COURT:  Okay.

10          MR. ESCOBAR:  I filed a motion in September.

11          THE COURT:  Good.  All right, thank you.

12          MR. ESCOBAR:  Thank you, your Honor.

13          THE COURT:  I honesty can't believe it's been a year.

14   All right.  Well, try to work it out soon -- resolve that very

15   soon.

16          MR. AURZADA:  May we be excused, your Honor?

17          THE COURT:  Yes.

18          MR. AURZADA:  Thank you.

19       **(This proceeding adjourned at 10:24 a.m.)**

20

21

22

23

24

25

CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.




_____          _September 15, 2015_


TONI HUDSON, TRANSCRIBER